IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| RLI INSURANCE COMPANY, | ) | C/A No: 6:20-cv-1289-DCC |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | **FIRST AMENDED COMPLAINT** |
| VS. | ) | |
| | ) | |
| INNOVATIVE EMPLOYER | ) | |
| SOLUTIONS, LLC D/B/A | ) | |
| PAYROLL+MEDICS, John Does 1-492, | ) | |
| ET AL., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

COMES NOW RLI INSURANCE COMPANY ("RLI"), Plaintiff, in the above-styled action, seeking equitable and declaratory relief and shows this Court the following:

## NATURE OF ACTION

1.      RLI files this action to obtain a judicial determination and declaration as to the parties' rights and obligations under a Miscellaneous Professional Liability Policy issued by RLI to INNOVATIVE EMPLOYER SOLUTIONS, LLC (IES) for the policy period January 1, 2020 to January 1, 2021 (the Policy).

2.      RLI's recent investigation has revealed that prior to applying for insurance with RLI, IES was aware that one of its vendors was arrested and charged with committing a $70 million bank fraud, which ultimately resulted in IES' clients' payroll tax monies not getting processed. As a result, IES' clients received delinquency notices, penalties, and fines. Subsequent to the Policy incepting, and the same day IES was sent a Change Endorsement providing coverage for all Prior Acts, IES submitted its first notice of potential claims relating to the non-payment of its clients' tax monies.

*RLI vs. IES*
First Amended Complaint
Page 2.

3.      An actual and justiciable controversy has arisen and now exists relating to the parties' rights, duties, and obligations under the Policy.  RLI seeks a declaratory judgment that: (a) RLI is entitled to rescind the Policy void *ab initio* because of material and intentional false statements in the Application for the Policy; (b) RLI is entitled to rescind the Change Endorsement to the Policy void *ab initio* because of material and intentional false statements in the Application and Disclosure form; and in the alternative that (c) there is no duty to defend nor a duty to indemnify IES under the Policy in connection with a Claim from IES' clients relating to the non-payment of payroll taxes.

## PARTIES AND JURISDICTION

4.      At all times material hereto, RLI is an entity organized under the laws of the State of Illinois with its principal place of business in the State of Illinois.

5.      Upon information and belief, IES is a limited liability corporation organized under the laws of South Carolina with its principal place of business located at 218 Trade Street, Greer, South Carolina.

6.      Upon information and belief, the principals of IES are Michael Murray and Jennifer Murray who are both residents of the state of South Carolina.

7.      Upon information and belief, Innovative Employer Solutions, LLC, does business as "Payroll+Medics".

8.      INNOVATIVE EMPLOYER SOLUTIONS, LLC d/b/a Payroll+Medics will be referred to herein as "IES."

9.      Upon information and belief Tropical Grille, Easley, LLC is an entity formed under the laws of South Carolina with its principal place of business in Easley, South Carolina.

10.    Upon information and belief, Vega Restaurant Group, LLC is an entity formed under the laws of South Carolina with its principal place of business in Greenville County, South Carolina.

11.    Upon information and belief, Tropical Grille Mauldin, LLC, is an entity formed under the laws of South Carolina with its principal place of business in Mauldin, South Carolina.

12.    Upon information and belief, Tropical Chicken Grill, LLC is an entity formed under the laws of South Carolina with its principal place of business in Greenville County, South Carolina.

13.    Upon information and belief, Tropical Grill Downtown, LLC, is an entity formed under the laws of South Carolina with its principal place of business in Greenville County, South Carolina.

14.    Upon information and belief JMA Restaurant Group, LLC is an entity formed under the laws of South Carolina with its principal place of business in Greenville County, South Carolina.

15.    Upon information and belief, M&R restaurant Group, LLP is an entity formed under the laws of South Carolina with its principal place of business in Greenville County, South Carolina.

16.    Upon information and belief, John Does 1-492 are other clients of IES who have been affected by the events described herein and who may be interested in the matters herein.

17.    Upon information and belief, the entities named in paragraphs 9 through 15 are clients of IES and will be referred to herein collectively as "Interested Client Parties."

18.     This is an action for declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure, for the purposes of determining a question of actual controversy between the parties.

19.     This action is currently ripe for adjudication.

20.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between RLI and the Defendant and the amount in controversy exceeds Seventy-Five Thousand and no/100 Dollars ($75,000.00) because (1) RLI's potential coverage limits are Two Million and no/100 Dollars ($2,000,000.00) and (2) the claim and/or potential claims being asserted against its insured, IES, exceed $75,000.00.

21.     Venue is proper in this district pursuant to 28 § U.S.C. 1391 (b)(1) because the Defendant's principal place of business is located in this judicial district.

## STATEMENT OF FACTS

### *Misappropriation of Funds*

22.     Upon information and belief, IES is a payroll service bureau engaged in the administration of professional payroll, tax, and HR+Benefit solutions for small businesses.

23.     Upon information and belief, at all times relevant herein, Michael Murray was a principal, partner, officer and/or director of IES.

24.     Upon information and belief, IES provides certain payroll solutions to clients, including the Interested Client Parties, pursuant to an agreement entitled Payroll Processing Tax Filing & Pre-Authorized Payment Services Agreements ("Payroll Services Agreements"), a sample of which is attached hereto as Exhibit "A".

25.     The Payroll Services Agreements provide, in part, "PAYROLL MEDICS hereby warrants and promises to perform the Payroll Tax Filing Services for the Client according to the

terms and conditions set forth herein within the time provided for by the Taxing Authorities unless prevented from doing so by causes and conditions beyond the reasonable control of PAYROLL MEDICS." **Exhibit A.**

26.    The Payroll Services Agreements provide in part, "if PAYROLL MEDICS makes an error or omission, which results in assessment by any taxing authority against the CLIENT, which results in penalties and interest, PAYROLL MEDICS will pay the assessed penalties and/or interest." **Exhibit A.**

27.    Upon information and belief, IES utilized one or more third-party companies, including MyPayrollHR and/or Cloud Payroll, LLC ("CloudPayroll"), for the purpose of debiting and depositing client tax funds as an interim step before they were paid to tax authorities when due by a centralized corporate tax return.

28.    Upon information and belief, IES entered into a licensing agreement with CloudPayroll on October 8, 2018, permitting IES to use CloudPayroll's cloud-based software for IES' clients' payroll administration, payroll tax processing, and related ACH transfers and cash management.

29.    Upon information and belief, clients and IES began using the CloudPayroll systems in January 2019.

30.    Upon information and belief, the CEO and/or principal of MyPayrollHR and CloudPayroll, Michael Mann, misappropriated corporate funds, including but not limited to certain payroll tax deposits and funds of IES and clients of IES.

31.    Upon information and belief, on or about September 5, 2019, the bank accounts of MyPayrollHR and CloudPayroll were frozen as a result of the misappropriation of corporate funds.

32.    Upon information and belief, as a result of the freezing of the bank accounts of MyPayrollHR and CloudPayroll, and/or theft committed by Michael Mann, the taxes of certain clients of IES were not paid and/or were not paid per required deadline.

33.    Upon information and belief, on or about September 6, 2019, IES was informed that Michael Mann had been arrested for charges related to a fraud scheme and that CloudPayroll was closed effectively immediately.

34.    Upon information and belief, on or about September 18, 2019, IES sent an email to certain clients notifying them that they "may have noticed tax settling into your account that may not have been swept," and that it would be "auditing each client's obligations and 'debiting the appropriate amount for collection during this short migration period." *See* Email String, attached as **Exhibit B** at P. 3 (redacted for privacy).

35.    On or about September 18, 2019, IES began receiving emails from clients providing notice that certain payroll tax payments had not been swept from their accounts.

36.    On or about September 18, 2019, Michael Murray of IES received electronic correspondences from a client (hereinafter the "Client") which indicated that taxes had not been swept from its account.  **Exhibit B** at P. 1.

37.    IES received an email from the Client on September 20, 2019, which states in relevant part, the following:

> *I need to have our taxes up to date immediately.  In addition to the problem from our last payroll (which you were obviously not paying taxes on time, as they had not been withdrawn from our account), I now see that you did not make at least 1 required tax payment for the PREVIOUS payroll.*
>
> *I need all of our required tax payments paid by Monday.*

*See* Email String, attached as **Exhibit C** at P. 2 (redacted for privacy).

38.    An email sent by the Client on September 24, 2019, states in relevant part, the following:

> *I need to talk with you about getting the taxes for the August 30th payroll paid. I have spoken with our insurance agent, [REDACTED], about our coverage. I assume you have also spoken with your insurance company. I understand that it is up in the air regarding how much money in the Mypayroll account will be recoverable for it will therefore take some time to find out how much money is missing. I understand that, but I also know that we are ultimately responsible for getting our payroll taxes and payroll withholdings paid in a timely manner. I want to talk about [REDACTED] paying the $7,500 in taxes a second time so late payments fees (to say nothing of potential tax liens) are completely out of the picture.*
>
> *My concern with doing this is getting recovery on our original payment and having that automatically given to the various tax agencies instead of back to us.*
>
> *Please let me know what you think about doing it this way.*

**Exhibit C** at P. 1.

39.    Upon information and belief, on or before September 25, 2019, IES reported the alleged fraud involving CloudPayroll to the IRS and FBI.

40.    On or about September 26, 2019, IES submitted a Tax Violation Complaint to the South Carolina Department of Revenue (SCDOR) that admitted the CEO of a New York payroll company [CloudPayroll] was arrested and charged in a $70 million bank fraud scheme and had "prevented withholding tax deposits from being made to the SCDOR" and requesting that "SCDOR recognize this unique situation and work with Payroll Medics and our clients to forgive and/or avoid penalties, late fees, fines, liens and collection efforts as a result of this admitted fraud." *See* Email Correspondence attached as **Exhibit D** (redacted).

41.    On or about October 23, 2019, IES received an email from an additional client which stated in relevant part:

> *Payroll medics is responsible for filing our payroll taxes every quarter. Third quarter taxes were due on October 15. Are you telling me that you guys did NOT*

*RLI vs. IES*
First Amended Complaint
Page 8.

*file my quarterly payroll taxes by October 15th, 2019?  I understand you were not part of that conversation but can you find out?*

*See,* Email Chain, attached as **Exhibit E** (redacted).

42.    Upon information and belief, no later than November 11, 2019, IES began receiving

copies of tax filing delinquency notices received by its clients.

43.    On December 2, 2019, an additional client sent an email which states in relevant

part:

*Yes, you can deduct the missed [amount] however, I would like an explanation for the missed sweep.  You have to agree that this would be very concerning to a business owner that is trusting Payroll Medics with our payroll.  I am paying an accountant to confirm that your company is providing the payroll services I am paying you for.*

*Could you please also check and see if the credit that you promised me for payroll services in November was given or let me know when that will be credited to my account?*

*See* Email String, attached as **Exhibit F**  (redacted).

44.    On December 12, 2019, the Client sent an email which states, in relevant part:

*I do not see that [my third quarter returns] were filed when I sign in to my SC Department of Revenue account however.  Also, I do not see the 9/5 deposit of $1,175.61 listed on the return for the SC withholding.*

*See* Email String, attached as **Exhibit G** at P. 3 (redacted)

45.    On December 20, 2019, the Client sent an email which states, in relevant part:

*I STILL show the quarterlies as not being filed on the SC Dept of Revenue.  I still don't see the $1,175.61 payment either.  I did see another notice form them giving an 'estimated' assessment.  I have attached a screenshot.*

**Exhibit G** at P. 2.

46.    Upon information and belief, as early as December 23, 2019, IES began sending

penalty abatement requests to state agencies on behalf of its clients.

47.    On or about December 23, 2019, IES sent a penalty abatement request to the North Carolina Department of Revenue (NCDOR).  *See* Correspondence to NCDOR, attached as **Exhibit H** (redacted).

48.    Upon information and belief, through December 31, 2019, at least ten IES clients forwarded to IES non-payment notices from various state agencies.

49.    On January 3, 2020, the Client transmitted an email that states in relevant part:

*It looks like the SC Dept of Revenue is now showing the 3rd quarter as being filed (as of Dec 11th).  We now have $635.20 in penalties, $14.90 in interest, plus the missing $1,175.61 payment showing outstanding.*

*For the 4th quarter, I show having 6 payrolls, but only 5 deposits made.*

**Exhibit G** at P. 2.

50.    Upon information and belief, on January 6, 2020, IES retained legal counsel to assist in advising clients in how to deal with the situation involving the non-payment of its clients' payroll taxes.

51.    On, January 9, 2020, IES received an email from another client which provided Comptroller of Maryland delinquency notices and asked, "I believe you said you would take care of these issues?" *See* Email String, attached as **Exhibit I** (redacted).

52.    On January 9, 2020, IES received an email from another client which states the following: "Please see attached to make sure the most updated fines are paid. Can anyone give me an update now that Michael has filed them on when we will receive a confirmation and when all fines will be paid by Payroll Medics?" *See* Email String, attached as **Exhibit J** (redacted).

53.    On January 14, 2020, the Client transmitted an email that states in relevant part:

*I still have a missing payment for the 3rd quarter.  I still have penalties and interest for that quarter as well.  I also still have a missing payment in the 4th quarter.*

*When will these payments be made?*

*RLI vs. IES*
First Amended Complaint
Page 10.

**Exhibit G** at P. 2.

54.    On January 23, 2020, the Client transmitted an email to IES that states in relevant

part:

> *We had someone from the SC Department of Revenue show up today at our business*
> *to hand the attached notice to one of our employees.*
>
> *I want a call by tomorrow noon at the latest to tell me how you are going to finally*
> *get all of the tax payments paid.*

**Exhibit G** at P. 1-2.

55.    On January 23, 2020, IES received email from another client which attached a

South Carolina Department of Revenue assessment and asked, "Can you give me an idea of when

this will be resolved?  We are getting kinda antsy." *See* Exhibit String, attached hereto as **Exhibit**

**K** (redacted).

56.    On January 24, 2020, the Client transmitted an email which states in relevant part:

> *I still haven't heard from you, so I will be contacting Ms. Simpson with the SC Dept*
> *or Revenue directly to pay the outstanding $8,825.71 that you have refused to pay,*
> *acknowledge or even give a response to.*
>
> *I will of course do what I can to collect this amount from you plus whatever other*
> *damages may be appropriate.*
>
> *I will no longer be doing business with Payroll Medics.*

**Exhibit G** at P. 1.

57.    On February 8, 2020, IES received an email from another client regarding

underpaid federal tax deposits of $14,200.84 and penalties of $3,731.07, which states in relevant

part, "The penalties and interest would be taken care by Payroll Medics."   *See* Email Chain,

attached hereto as **Exhibit L** (redacted).

58.     On February 11, 2020 IES received an email from another client that states that payments were late and that they received a letter that their assets would be seized.  *See* Email Chain, attached as **Exhibit M** (redacted).

59.     On February 14, 2020 at 8:40 A.M., another client informed IES that it needed to "file claims with [its] insurance company for the money that was stolen from your customers," and that IES was "responsible for filing the claims in [its] insurance and then [its] insurance will go after the company that stole the money." *See* Email Chain, attached as **Exhibit N** (redacted).

60.     On February 17, 2020, IES received an email from another client which alleges that the payments were "your responsibility as our payroll company." *See* Email Chain, attached as **Exhibit O** (redacted).

61.     On February 20, 2020, IES received an email from the Client which states in relevant part: "Just as I am responsible to the IRS and DOR to make these payments, you are responsible to us. You elided [sic] this fact. I need you to address how and when you are going to fulfill your responsibilities to us to have these funds paid." *See* Email Chain, attached as **Exhibit P** (redacted).

62.     On February 20, 2020, IES received an email from another client which states, "you said you were taken care of the interest and penalties that they did not abate." *See* Email Chain, attached as **Exhibit Q** (redacted).

63.     Based on the foregoing, beginning in September 2019 through at least February 14, 2020, IES received communications from its clients demanding updates on when payments will be made by IES, demanding that IES resolve the payment issues, demanding that IES file a claim with its insurance company for the money that was stolen, demanding that IES pay penalties and

interest, and advising that IES is responsible for their claims, including those attached hereto as

**Exhibits B, C, E, F, G, I, J, K, L, M, N, O, P and Q** (redacted).

### *Procurement of Insurance with RLI*

64.    On or about October 25, 2019, IES executed a Miscellaneous Professional Liability

Insurance Application ("Application"), a copy of which is attached hereto as **Exhibit R.**

65.    The Application was signed by Michael Murray.  **Exhibit R.**

66.    Michael Murray is identified as "Other Key Personnel" on the Application.  **Exhibit R.**

67.    On the Application, the following question "12a" was answered, "No":

*Have any claims been made or legal action been brought against your firm, its predecessor(s) or any current or former principal, partner, director, officer or employee in the past five years?*

**Exhibit R.**

68.    On the Application, the following question "12b" was answered, "No":

*After complete investigation and inquiry, do any of the principals, partners, directors, officers, employees, or insurance managers have knowledge of any act, error, omission, fact, incident, situation, unresolved job dispute, accident, or any other circumstance that is or could be the basis for a claim under this proposed insurance policy?*

***Report knowledge of all such incidents to your current carrier prior to your current policy expiration.*** *The proposed insurance being applied for will not respond to incidents about which you had knowledge prior to the effective date of the policy nor will coverage apply to any claim or circumstance identified or that should have been identified in Questions 12a and 12b of this application.*

**Exhibit R.**

69.    Prior to signing the Application, Michael Murray was aware that the CEO of his

vendor, CloudPayroll, had been arrested on a $70 million dollar fraud scheme, that because of the

fraud scheme IES' clients payroll taxes had not been processed, had reported the fraud to the FBI

and IRS, had sent abatement requests on behalf of his clients, and had received client emails regarding the penalties and delinquency notices and demanding IES take care of and/or pay the outstanding payroll taxes, attached as **Exhibits B, C, D and E.**

70.     Prior to signing the Application, IES had received the email correspondences attached as Exhibits B, C, D and E.

71.     Prior to signing the Application, IES had submitted the Tax Violation Complaint to the South Carolina Department of Revenue (SCDOR).  **Exhibit D.**

72.     On or about October 25, 2019, the Application was submitted to RLI by and through AmWins Insurance Services, LLC (hereinafter "Agent") by correspondence attached hereto as **Exhibit R.**

73.     At no relevant time has the Agent been an agent of RLI.

74.     Upon information and belief, the Agent is a client of IES who has been impacted by the fraud scheme.

75.     On or about October 30, 2019, RLI provided a quotation for a policy of insurance "based on the information represented by your client in the application."   *See* Quote, attached hereto as **Exhibit T** (redacted).

76.     The Agent requested that the policy be bound, and requested limits of $2 Million. *See* Email Chain, attached as **Exhibit U.**

77.     Upon information and belief, prior to January 1, 2020, IES received correspondences from more than ten (10) clients making claims of failure of IES to file payroll taxes.

78.     No emails nor any other information regarding prior claims or circumstances that could give rise to a claim and/or potential claim of which IES had notice, were disclosed or provided to RLI prior to January 1, 2020.

79.     RLI    issued    the    TARGET    PROFESSIONALS    MISCELLANEOUS PROFESSIONAL LIABILITY Policy number RTP0017787 to IES with an effective policy period of January 1, 2020, to January 1, 2021, (the "Policy") a certified copy of which is attached hereto as **Exhibit V**[1].

80.     The declaration page of the Policy includes the following (emphasis in original):

**NOTICE:  THIS POLICY COVERS ONLY THOSE CLAIM FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND FIRST REPORTED TO THE INSURER DURING THE POLICY PERIOD, THE AUTOMATIC EXTENDED REPORTING PERIOD, OR IF APPLICABLE, DURING THE EXTENDED REPORTING PERIOD.  DEFENSE COSTS SHALL BE APPLIED AGAINST THE DEDUCTIBLE.  PLEASE READ YOUR POLICY CAREFULLY.**

**Exhibit V.**

81.     The Policy provides, in part:

*12.     REPRESENTATIONS AND SEVERABILITY*

*The **Insureds** represent that the particulars and statements contained in the Application and all attachments are true and agree that:*

*a.   those particulars and statements are the basis of the Policy and are to be considered as incorporated into and constituting a part of the Policy;*

*b.   those particulars and statements are material to the acceptance of the risk assumed by the Insurer; and*

*c.   this Policy is issued in reliance upon the truth of such representations.*

*Except for material facts or circumstances known to the person or persons signing the Application, no statement in the Application or knowledge of or information*

---

[1] On the date the Policy was issued, the policy did not include the Change Endorsement found on page 32 of 32 of Exhibit V.

*possessed by an* **Insured** *shall be imputed to any other insured for the purpose of determining the availability of coverage.*

**Exhibit V.**

82.     At no time prior to the effective date of the Policy, January 1, 2020, did IES or anyone on its behalf inform RLI of the claims and/or potential claims of IES' clients against IES.

83.     Upon information and belief, IES was insured by a carrier other than RLI for the effective period beginning January 1, 2019 until January 1, 2020.

84.     The Policy is not a renewal of a previous policy by RLI.

*Procurement of the Change Endorsement*

85.     On or about January 28, 2020, the Agent, on behalf of IES, sent an inquiry to RLI indicating, "I just wanted to be sure I am correct that the retro date is no longer 1/1/2019 since the insured increased the limits to $2M".   *See* Email Chain, attached as **Exhibit W** (redacted).

86.     On or about January 31, 2020, RLI informed the Agent that "coverage was going to be retro inception whenever coverage took place unless they purchased the full prior acts endorsement"**. Exhibit W.**

87.     On or about February 4, 2020, IES, by and through the Agent, requested coverage for "full prior acts", and was informed that this would require payment of an additional premium and submission of a completed claims disclosure form.  **Exhibit W.**

88.     On or about February 14, 2020, Michael Murray signed an incident disclosure form ("Disclosure") on behalf of IES, a copy of which is attached hereto as **Exhibit X.**

89.     On the Disclosure, Michael Murray answered the following question, "No":

*a.  After inquiry, do any directors, officers, principals, partners, insurance managers, of the firm for which coverage is sought, have knowledge of any incident, a circumstance, an event or unresolved fee dispute that may result in a claim?"*

**Exhibit X.**

90.    On the Disclosure, Michael Murray answered the following question, "No":

b.   *Within the  past five years, have any claims been made or legal action brought against the firm, its predecessor(s), or any past or present principals, partners, insurance managers, or employees?" Provide details.*

**Exhibit X.**

91.    The Disclosure includes the following definition of "Claim":

*Claim(s) means a demand received by the Insured for money or services and which alleges a wrongful act.  Claim(s) includes but it not limited to lawsuits, petitions, arbitrations or other alternative dispute resolution requests filed against the insured.*

**Exhibit X.**

92.    When Michael Murray signed the Disclosure, he was aware of the above-referenced events and he had received the emails and document attached as **Exhibits B, C, D, E, F, G, I, J, K, L, M, and N.**

93.    When Michael Murray signed the Disclosure, he had received additional emails from clients making claims similar to that of the Client.

94.    On February 14, 2020 the Agent transmitted the Disclosure to RLI.  **Exhibit W.**

95.    In reliance on the Disclosure, RLI issued a Change Endorsement with an effective date of February 14, 2020, attached as **Exhibit Y** changing the Retroactive Date to "Full Prior Acts."

96.    At no time on or prior to the submission of the Loss Notice did IES or anyone on its behalf inform RLI of any claims and/or potential claims.

97.    Emails attached hereto as Exhibits B, C, D, E, F, G, I, J, K, L, M, N, O, P, and Q were provided to RLI on March 3, 2020, as evidenced by the emails themselves.

### *Submission of the Claim to RLI*

98.    A Liability Notice of Occurrence/Claim ("Loss Notice") to RLI, attached hereto as

**Exhibit Z** (redacted) dated February 20, 2020 was submitted to RLI.

99.    The Loss Notice included a description of the Claim as follows:

*We are the victim of alleged financial fraud perpetrated by Michael Mann (as reported by various news and media outlets).  Michael Mann owned interest in several payroll companies across the U.S., including MyPayroll HR and Cloud Payroll, LLC, and allegedly committed millions of dollars in fraud of various forms in an ongoing scheme whose boundaries and nature we do not yet know (as reported by various news and media outlets).*

*The FBI recently raided Michael Mann's home.*

*His bank, Pioneer Bank in Albany, NY froze all of his and his company's bank accounts.*

*For Payroll Medics specifically, his actions caused the inability to access the various funds which we had stored in a Pioneer bank account for the amount other taxes.  As a subsidiary of Mann's company, our client tax funds were deposited in his account as an interim step to being paid in to tax authorities when due by a centralized corporate tax team.*

*Payroll Medics is now facing claims from clients who must re-pay the stolen tax, which was misappropriated by Michael Mann, CEO of Cloud Payroll, LLC.*

*...*

*Mann was arrested on Sept. 23 and appeared in federal court in Albany on a criminal complaint charging him with committing $70 million in bank fraud.*

**Exhibit Z.**

100.    On or about March 3, 2020, Michael Murray transmitted the emails and documents

including **Exhibits B, C, D, E, F, G, H, I, J, K, L, M, N, O, P and Q** to RLI.

101.    The Loss Notice indicates that IES is facing claims of more than one client relating

to the above referenced events.  **Exhibit Z.**

102.    The claims faced by IES and described in the Loss Notice include claims and/or potential claims of the Interested Client Parties and others based on the facts and circumstances described in the Loss Notice constitute a single Claim under the Policy (hereinafter "the Claim")[2].

## COUNT I
### (Declaration that RLI is Entitled to Rescind the Policy)

103.    The Plaintiff incorporates all prior paragraphs of this Complaint as if re-stated herein.

104.    Defendant's response of, "No" in response to Question 12a and Question 12b regarding claims and potential claims on the Application was false.  **Exhibit R.**

105.    Defendant was aware that its responses on the Application were false, as it had received correspondences from the Client making it aware of the Client's claims and/or potential claim.  **Exhibits B, C, D and E.**

106.    Based on the foregoing events described above, including but not limited to the fact that IES submitted a Tax Violation Complaint to the SCDOR, Defendant was aware that its responses on the Application were false.  **Exhibit D.**

---

[2] But even if the claims described in the Loss Notice, the claims being brought by the Interested Client Parties as well as any potential claims by IES clients, could be viewed as separate Claims unto themselves, they would still be considered and treated as a single Claim under the Policy with a single per Claim Limit of Liability.  The Policy provides in pertinent part under section 6. LIMITS OF LIABILITY AND DEDUCTIBLE: … *(g) Claims based upon or arising out of the same Wrongful Act, interrelated Wrongful Acts, or a series of similar or related Wrongful Acts shall be considered a single Claim subject to one Claim Limit and shall be considered first made during the Policy Period, the Automatic Extending Reporting Period or Extending Reporting Period, if applicable, in which the earliest Claim arising out of such Wrongful Act(s) was first made and all Damages from such Claims shall be subject to one Limit of Liability that applies to such earliest Claim, regardless of whether the earliest such Claim predates the Policy Period.*

107.    Defendant made these false statements on the Application with the intent to deceive and defraud RLI, as IES had received correspondence from multiple clients regarding claims and/or potential claims.

108.    Defendant's representations regarding claims and/or potential claims was material to the risk to RLI, as if RLI had been aware of the claim and/or potential claims it would not have issued the Policy to IES.  *See* **Exhibit T.**

109.    Defendants' statements were made with intent to defraud, as Defendant failed to disclose the claim and/or potential claim that is the subject of **Exhibits B, C, D and E** when it executed and submitted the Application.

110.    Defendants' statements were made with the intent to defraud RLI to obtain insurance coverage for the claim set forth in **Exhibit Z.**

111.    At no time prior to the issuance of the Policy did IES disclose to RLI on its Application any information regarding the claims and/or potential claims set forth in Exhibit X or that it had submitted a Tax Violation Complaint to the SCDOR.

112.    RLI had a right to rely on the representations of IES on the Application.  **Exhibit R.**

113.    The representations of IES on the Application materially affected the acceptance of the risk to be covered by the Policy by RLI.  **Exhibits Q and R.**

114.    RLI relied on the false representations of IES on the Application in issuing the Policy.  **Exhibit V.**

115.    RLI is prepared to return the premium upon an order form this Court entering a judgment that RLI is entitled to rescind the Policy.

116.    Therefore, RLI is entitled to a declaratory judgment that it is entitled to rescind the Policy and a declaration that the Policy is void *ab initio*.

## COUNT II
**(Declaration that RLI is Entitled to Rescind the Change Endorsement)**

117.    The Plaintiff incorporates all prior paragraphs of this Complaint as if re-stated herein.

118.    Defendant executed the Disclosure for the purpose of obtaining the Change Endorsement to obtaining coverage under the Policy for acts prior to January 1, 2020.  **Exhibit X.**

119.    Defendant's response of, "No" in response to questions "a" and "b" regarding claims and potential claims or claims on the Disclosure was false.  **Exhibit X.**

120.    Defendant was aware that its responses on the Disclosure were false when it was executed, as it was in receipt of correspondence from clients making them aware of claims and/or potential claims.  **Exhibits B, C, D, E, F, G, H, I, J, K, L, M, and N.**

121.    Defendant made the false statements on the Disclosure with the intent to deceive and defraud RLI, as IES had received correspondence clients making them aware of prior claims and potential claims.  **Exhibits B, C, D, E, F, G, H, I, J, K, L, M, and N.**

122.    Defendant made the false statements on the Disclosure with the intent to deceive and defraud RLI to obtain insurance coverage for the Claim it submitted on February 20, 2019.  **Exhibits W and X.**

123.    Defendant's representations regarding the claims and/or potential claims was material to the risk, because had RLI had been aware of the claims and/or potential claims it would not have issued the Change Endorsement to IES.

124.    Defendant's false statements were made with the intent to deceive and defraud RLI, as Defendant:

a.    Failed to disclose the Claim when it executed and submitted the Disclosure;

b.    Submitted the Loss Notice on the same day it received the Change Endorsement; and

c.    Sought to amend the Policy to include prior acts before making the Claim.

125.    The false representations of IES on the Application materially affected the acceptance of the risk to be covered by the Policy by RLI.

126.    The false representations of IES on the Disclosure materially affected the acceptance of the risk to be covered by the Change Endorsement by RLI.

127.    RLI had a right to rely on the representations of IES on the Application.

128.    RLI did rely on the representations of IES on the Application.

129.    RLI had a right to rely on the representations of IES on the Disclosure.

130.    RLI did rely on the representations of IES on the Disclosure.

131.    RLI is prepared to return the additional premium paid for the Change Endorsement upon an order from this Court granting rescission of the Change Endorsement.

132.    If the Court does not rescind the Policy, RLI is entitled to a declaration that RLI is entitled to rescind the Change Endorsement.

133.    Therefore, RLI is entitled to a declaratory judgment that it is entitled to rescind the Change Endorsement and a declaration that the Change Endorsement is void *ab initio*.

## **COUNT III**
### **(Declaratory Judgment - Wrongful Acts Occurred Outside of the Policy Period)**

134.    The Plaintiff incorporates all prior paragraphs of this Complaint as if re-stated herein.

135.    There is no coverage under the Policy for the Claim because the alleged Wrongful Acts occurred prior to the Retroactive Date.

136.    The Policy provides as follows:

*1.    INSURING AGREEMENTS*

*a.    The Insurer will pay on behalf of the Insured, Claim Expenses and Damages in excess of the Deductible that the Insured shall become legally obligated to pay because of Claims first made against the Insured during the Policy Period and first reported to the Insurer during the Policy Period, the Automatic Extended Reporting Period, or if applicable, during the Extended Reporting Period, for Wrongful Acts, committed on or subsequent to the Retroactive Date and before the end the end of this Policy Period, to which this insurance applies.*

**Exhibit V.**

137.    The Policy definition of *"Claim"* includes *"a. a demand for money as compensation for a Wrongful Act."* and further provides, *"A Claim shall be considered made when any Insured or the Insured's legal representative or agent first receives notice of the claim."*

**Exhibit V.**

138.    The Policy provides the following definition for "Wrongful Act":

*"Wrongful Act" means any actual or alleged error, omission or negligent act, committed solely in the rendering of or failure to render Professional Services by an Insured or any person or entity for which the Insured is legally liable. Wrongful Act also means any actual or alleged error, omission or negligent act committed solely in the rendering of or failure to render Professional Services by an Insured or any person or entity for which the Insured is legally liable and that results in Personal Injury.*

**Exhibit V.**

139.    RLI has brought this action seeking a declaratory judgment that it is entitled to rescind the Policy, or in the alternative, to rescind the Change Endorsement.

140.    The Policy only provides coverage for Claims for Wrongful Acts "committed on or subsequent to the Retroactive Date."

141.    Because the Change Endorsement was procured by fraud and should be rescinded and void *ab initio*, the Retroactive Date of the RLI Policy is January 1, 2020.

142.    The alleged Wrongful Acts in the Claim as set forth in the Loss Notice, first occurred during the third and fourth quarter of 2019, and prior to January 1, 2020.

143.    The missed payments, late payments, and related interest and penalties were caused by Wrongful Acts committed prior to the Retroactive Date of the Policy.

144.    Therefore, RLI is entitled to a declaration no coverage for the Claim, and that RLI has no duty to defend or indemnify IES against the Claim.

## COUNT IV
### (Declaratory Judgment – No Damages)

145.    The Plaintiff incorporates all prior paragraphs of this Complaint as if re-stated herein.

146.    In the alternative, if the Policy and/or Change Endorsement are not rescinded, there is no coverage for the Claim as set forth in the Loss Notice under the Policy for the following separate independent reason.

147.    The Policy defines Damages as follows:

*"Damages" means monetary judgments or settlements, including but not limited to compensatory damages, prejudgment and post-judgment interest that an Insured is legally obligated to pay, and punitive or exemplary damages to the extent such damages are insurable under applicable law, but shall not mean or include any of the following:*

a.    *that portion of any multiplied damage award that exceeds the amount multiplied, criminal or civil fines or penalties imposed by law, taxes, matters deemed uninsurable under the law pursuant to which this Policy shall be construed; or*
b.    *the return, reduction or dispute over any fees, deposits, expenses, costs, or commissions charged or collected by the Insured.*

*For the purpose of determining the insurability of punitive damages or exemplary damages, the laws of the jurisdiction most favorable to the insurability of such damages shall control that determination, provided that such jurisdiction has a substantial relationship to the Named Insured or to the Claim giving rise to such punitive damages and exemplary damages.*

**Exhibit V.**

148.    The Claim seeks damages including re-payment of the stolen tax money which was misappropriated by Michael Mann.  **Exhibit Z.**

149.    The Client emails received by IES also request payment of late fees and penalties.

150.    There is no coverage for any alleged Damages related to the Claim that fall outside the Policy's definition of Damages.

151.    Therefore, RLI is entitled to a declaration of no coverage for the Claim and that RLI has no duty to defend or indemnify IES against the Claim.

**COUNT V**
**(Declaratory Judgment - Exclusion re Known Prior Circumstances)**

152.    The Plaintiff incorporates all prior paragraphs of this Complaint as if re-stated herein.

153.     In the alternative, if the Policy and/or Change Endorsement are not rescinded, there is no coverage for the Claim as set forth in the Loss Notice under the Policy for the following separate independent reason.

154.    There is no coverage under the Policy for the Claim because IES was aware of prior Circumstances prior to the Policy Period that form the basis for the Claim.

155.    The Policy sets forth the following exclusion:

*5.    EXCLUSIONS*

*The Insurer shall not be liable for Damages or Claim Expenses in connection with any Claim arising out of, directly or indirectly resulting from or in consequence of or in any way involving:*

e.    *any Circumstance of which any partner, member, director, or officer of the Insured was aware prior to the effective date of this Policy and could have reasonably expected to give rise to a Claim; or any future Claim or litigation based upon or derived from the same or essentially the same Circumstance; provided that, if this Policy is a renewal of a Policy or Policies previously issued by the Insurer and if the coverage provided by the Insurer was continuous from the effective date of the first such other Policy to the effective date of this Policy, the reference in this*

*Exclusion to "effective date" will mean the effective date of the first Policy under which the Insurer first provided continuous coverage to an Insured.*

**Exhibit V.**

156.    The Policy defines a "*Circumstance*" as "*any fact, situation, even or occurrence that could reasonably be the basis for a Claim.*" **Exhibit V.**

157.    As set forth hereinabove, IES had knowledge of a Circumstance that is the subject of the Loss Notice prior to the effective date of the Policy.  **Exhibits B, C, D, E, F and G.**

158.    The Policy Period is from 12:01 A.M. on 01/01/2020 to 12:01 A.M. on 01/01/2021.

**Exhibit V.**

159.    The effective date of the policy is January 1, 2020.  **Exhibit V.**

160.    Prior to January 1, 2020, IES was aware that its client's various payroll obligations during the third and fourth quarters of 2019 had not been timely paid.  **Exhibits B, C, D, E, F and G.**

161.    Prior to January 1, 2020, IES was aware that certain clients had been assessed penalties for late payroll tax payments.

162.    Prior to January 1, 2020, IES had submitted a Tax Violation Complaint to the SCDOR requesting abatements due to the $70 million dollar tax fraud scheme.  **Exhibit D.**

163.    Based on the foregoing, including but not limited to those described herein above, a reasonable person would have been on notice that a Circumstance could have reasonably expected to give rise to the Claim  prior to January 1, 2020.

164.    RLI is entitled to a declaration of no coverage for the Claim and that RLI has no duty to defend or indemnify IES against the Claim.

**COUNT VI**
**(Declaratory Judgment - Tax Monies Exclusion)**

*RLI vs. IES*
First Amended Complaint
Page 26.

165.    The Plaintiff incorporates all prior paragraphs of this Complaint as if re-stated herein.

166.    In the alternative, if the Policy and/or Change Endorsement are not rescinded, there is no coverage for the Claim as under the Policy for the following separate independent reason.

167.    The Policy includes an Endorsement Entitled "Human Resources Consulting Services (II)" which provides the following:

*2.    Section 5 EXCLUSIONS, is amended to include the following:*

*5.    EXCLUSIONS*

*The Insurer shall not be liable for Damages or Claim Expenses in connection with any Claim arising out of, directly or indirectly resulting from or in consequence of or in any way involving:*

*...*

- *A Claim for premiums, return premiums, commissions or tax monies.*

**Exhibit V.**

168.    The Claim includes claims for the payment of tax monies.

169.    The Claim is excluded by the above referenced endorsement.

170.    RLI is therefore entitled to a declaration of no coverage for the Claim and that RLI has no duty to defend or indemnify IES against the Claim.

**COUNT VII**
**(Declaratory Judgment – Failure to Obtain Insurer's Consent to Settlement)**

171.    The Plaintiff incorporates all prior paragraphs of this Complaint as if re-stated herein.

172.    In the alternative, if the Policy and/or Change Endorsement are not rescinded, there is no coverage for the Claim under the Policy for the following separate independent reason.

173.    The Policy includes in part the following provision:

**3.    DEFENSE AND SETTLEMENT**

*The Insurer has the right and duty to defend any Claim to which this insurance applies.*

*...*

*An Insured shall not demand or agree to arbitration or mediation of any Claim after a Claim is made without prior written consent of the Insurer. An Insured, shall not, except at personal cost, make any offer or payment, admit any liability, settle any Claim, assume any obligation, or incur any expense without the Insurer's prior written consent. Any such offer or payment, admission of liability, settlement, assumption of any obligation, or expense incurred without the Insurer's prior written consent shall be the sole obligation of the Insured.*

**Exhibit V.**

174.    Upon information and belief, IES has made offers of payment, made admissions of liability, made efforts to settle, and/or assumed certain obligations with respect to clients who are the subject of the Loss Notice.

175.    IES has made these offers and/or admissions and offers and/or agreements to compromise without giving notice to and/or without obtaining the consent of RLI.

176.    IES has therefore failed to comply with the terms of the Policy.

177.    RLI is entitled to a declaration that IES is not entitled to coverage for any amount that IES must pay pursuant to an obligation that violates this provision, including but not limited to:

      a.  any payment made to settle a Claim made without RLI's consent;

      b.  any payment or obligation to pay made pursuant to an admission made by IES without RLI's consent;

      c.  any promise or agreement to pay made by IES without RLI's consent.

178.    RLI is therefore entitled to a declaration of no coverage for the Claim and that RLI has no duty to defend or indemnify IES against the Claim.

**COUNT VIII**
**(Declaratory Judgment - Express Warranties Exclusion)**

179.    The Plaintiff incorporates all prior paragraphs of this Complaint as if re-stated herein.

180.    In the alternative, if the Policy and/or Change Endorsement are not rescinded, there is no coverage for the Claim under the Policy for the following separate independent reason.

181.    The Policy sets forth exclusions which include the following:

**5.    EXCLUSIONS**

*The Insurer shall not be liable for Damages or Claim Expenses in connection with any Claim arising out of, directly or indirectly resulting from or in consequence of or in any way involving:*

d.    *any express warranties or guarantees by an Insured, or liability assumed by the insured under any contract or agreement, unless insured would have been legally liable in the absence of such contract or agreement.*

**Exhibit V.**

182.    Upon information and belief, IES entered into Payroll Service Agreements with its clients wherein IES made express warranties and guaranties.

183.    RLI is therefore entitled to a declaration that the Claim is excluded by the Policy and that RLI has no duty to defend or indemnify IES against the Claim.

**COUNT IX**
**(Declaratory Judgment – Contractual Liability Exclusion)**

184.    The Plaintiff incorporates all prior paragraphs of this Complaint as if re-stated herein.

185.    In the alternative, if the Policy and/or Change Endorsement are not rescinded, there is no coverage for the Claim under the Policy for the following separate independent reason.

186.    The Policy sets forth exclusions which include the following:

**5.    EXCLUSIONS**

*The Insurer shall not be liable for Damages or Claim Expenses in connection with any Claim arising out of, directly or indirectly resulting from or in consequence of or in any way involving:*

d.    *any express warranties or guarantees by an Insured, or liability assumed by the insured under any contract or agreement, unless insured would have been legally liable in the absence of such contract or agreement.*

**Exhibit V.**

187.    Upon information and belief, IES entered into Payroll Service Agreements with its clients wherein IES contractually assumed liability to pay for penalties and interest related to errors or omissions, and various clients have alleged that Payroll Medics is obligated to pay their assessed penalties and interest.

188.    RLI is therefore entitled to a declaration that the Claim is excluded by the Policy and that RLI has no duty to defend or indemnify IES against the Claim.

## COUNT X
### (Declaratory Judgment - Claim Made to Prior Carrier)

189.    The Plaintiff incorporates all prior paragraphs of this Complaint as if re-stated herein.

190.    In the alternative, if the Policy and/or Change Endorsement are not rescinded, there is no coverage for the Claim under the Policy for the following separate independent reason.

191.    The Policy sets forth the following exclusion:

*5.*    ***EXCLUSIONS***

*The Insurer shall not be liable for Damages or Claim Expenses in connection with any Claim arising out of, directly or indirectly resulting from or in consequence of or in any way involving*

f.    *any Circumstance or Claim, which prior to the effective date of this Policy was the subject of any notice under any prior insurance policy.*

**Exhibit V.**

192.    If the Circumstance and/or Claim were the subject of any notice under any prior insurance policy, the Claim set forth in the Loss Notice is excluded under the terms of the Policy.

193.    RLI is therefore entitled to a declaration of no coverage for the Claim and that RLI has no duty to defend or indemnify IES against the Claim.

WHEREFORE, Plaintiff RLI respectfully requests this Honorable Court enter judgment in its favor and to declare and enter judgment as follow:

a.    That RLI is entitled to rescind the Policy;

b.    That RLI is entitled to rescind the Change Endorsement;

c.    That there is no coverage for the Claim under the Policy, and that RLI has no duty to defend or indemnify INNOVATIVE EMPLOYER SOLUTIONS, LLC d/b/a PAYROLL+MEDICS with regards to the Claim;

d.    That there is no coverage for any claim of the Interested Client Parties or any other client of IES under the RLI Policy for the Claim;

e.    That RLI be awarded its costs incurred in this action; and

f.    For such other and further relief as may be deemed appropriate.

<div style="margin-left:40%">

_____
Robert T. Lyles, Jr., Esq. (Fed ID 3029)
Allen Leland DuPre, Esq. (Fed ID 7252)
LYLES & ASSOCIATES, LLC
1037 Chuck Dawley Blvd., STE G100
Mount Pleasant, South Carolina 29464
T: (843) 577-7730
F: (843) 577-7172
rtl@lylesfirm.com
ald@lylesfirm.com
**ATTORNEYS FOR PLAINTIFF**
**RLI INSURANCE COMPANY**

</div>

Charleston, South Carolina
July 14, 202020